**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JERRI L. DAWSON; DAVID EMRY;
BYRON FOLTZ; SHELLY N. SOGGA,
individuals,
            *Plaintiffs-Appellants,*

            v.

CITY OF SEATTLE, a municipal
corporation; GIL KERLIKOWSKE,
City of Seattle Chief of Police, in
his official capacity; KING COUNTY,
WASHINGTON; ALONZO L. PLOUGH,
Director, Seattle-King County
Department of Public Health, in
his official capacity; PERRY LEE,
Health and Environmental
Investigator II, Seattle-King
County Department of Public
Health, in his official and
individual capacity; BILL LASBY,
Health and Environmental
Investigator IV, Seattle-King
County Department of Public
Health, in his official and
individual capacity,
            *Defendants-Appellees.*

No. 03-35858

D.C. No.
CV-02-01046-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
February 17, 2005—Seattle, Washington

927

Filed January 24, 2006

Before: Betty Binns Fletcher, Ronald M. Gould,
Circuit Judges, and Samuel P. King,* District Judge.

Opinion by Judge Gould;
Concurrence by Judge B. Fletcher

---

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

## COUNSEL

Jose F. Vera, Seattle, Washington; Margaret M. Boyle, Seattle, Washington, for the plaintiffs-appellants.

Linda M. Gallagher, Senior Deputy Prosecuting Attorney, Seattle, Washington; Heather L. Carr, Stafford Frey Cooper, Seattle, Washington, for the defendants-appellees.

---

## OPINION

GOULD, Circuit Judge:

Plaintiffs-Appellants Jerri L. Dawson, David Emry, Byron Foltz, and Shelly N. Sogga (Plaintiffs) appeal the district court's orders denying their motion for summary judgment and granting summary judgment to the defendants: Alonzo Plough, Bill Lasby, Perry Lee, King County, Gil Kerlikowske, and the City of Seattle (Defendants), thereby extinguishing Plaintiffs' 42 U.S.C. § 1983 claims.[1] Plaintiffs at pertinent times were tenants of boardinghouses inspected by public health officials and secured by Seattle police. Defendants Plough, Lasby, and Lee at pertinent times were employees of the Seattle-King County Department of Public Health. Defendant Kerlikowske was Chief of Police for the City of Seattle during the events underlying this case.

Plaintiffs argue that the district court erred by granting Defendants' motions for summary judgment and that Plaintiffs are entitled to judgment as a matter of law because the search underlying this case violated the Fourth Amendment; because King County's failure to teach its public health inspectors a constitutionally proper procedure to obtain and

---

[1]This matter came before the district court on cross-motions of Plaintiffs and of Defendants each seeking summary judgment. On this appeal, Plaintiffs argue that they were entitled to prevail on the undisputed facts. As a general matter, we agree that the material facts are not in dispute. However, because the district court granted Defendants' motions, we consider the facts in the light most favorable to Plaintiffs to the extent there is any factual dispute. *See United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).

execute search warrants caused the allegedly unconstitutional search; because, during the search, Plaintiffs were detained by the Seattle police unreasonably and thus unconstitutionally; and because the City of Seattle's custom or policy of detaining a building's occupants pending a police search caused the allegedly unconstitutional detention. Further, Plaintiffs argue that if they are not entitled to judgment as a matter of law, there is a genuine issue of material fact that would preclude summary judgment whether their detention pending search was reasonable. Finally, Plaintiffs contend that the district court abused its discretion in awarding costs to Defendants. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

On August 8, 1999, Terminix, a pest control company, dispatched Richard Coppock to inspect two Seattle boardinghouses, located at 6418 and 6420 Brooklyn Avenue NE, for ants and fleas. Coppock inspected all of the occupied boarders' rooms, the kitchens, the basements, as well as several sheds and a shack located in the backyards. During his inspection, Coppock observed fleas, maggots, ants, sal bugs, earwigs, German roaches, rat urine, and rat feces throughout both houses. He noted that many of the doors inside the boardinghouses fit too loosely in their frames and, as a result, rats or other pests could pass freely from room to room. Coppock also observed rotting food, used food wrappers, garbage, and piles of dirty clothing inside many of the boarders' rooms. In the backyards, Coppock saw piles of wood, junk, and an automobile raised on blocks. In Coppock's opinion, these conditions invited rodents, particularly rats, to infest the boardinghouses. In his professional judgment, the rotting food in both houses would attract rats, and the piles of debris, both inside and outside the houses, provided sites in which they could nest. Although Coppock could not determine whether the properties were then infested because rats are nocturnal and he inspected the properties during the day, Coppock concluded that "[t]hese two properties were the worst examples

of rodent and insect infestation and rodent harborage I had ever seen in a residential setting." During the inspection, the building manager, Todd Ade, who appeared drunk to Coppock, bragged that his operation of these boardinghouses was "free money." Concerned that the tenants were living in filthy and potentially unhealthy conditions, Coppock reported his observations and views to Sandra Watson, an Assistant City Attorney; it was the first time that he had ever made such a report.

Watson verified that Coppock was a licensed pest exterminator, that he had inspected the boardinghouses for Terminix, and that his allegations were based on personal observations. Watson organized a meeting with representatives from the City of Seattle and King County agencies that had jurisdiction over the city and county ordinance and code violations described by Coppock, including the Seattle-King County Department of Public Health (DPH). Two DPH Health and Environmental Investigators, Bill Lasby and Perry Lee, responded to Coppock's complaint by visiting the properties and requesting Mr. Ade's permission to inspect them. Mr. Ade refused to let Lasby and Lee enter, and Ade told them to "get a search warrant" if they wanted to search either property. Unable to search inside, Lasby and Lee proceeded to examine the exterior of the two boardinghouses. Although Lasby and Lee observed structural damage to both houses, as well as "accumulated debris in plastic bags and overgrowth providing rodent harborage," they could neither verify nor disconfirm Coppock's allegations based on their external inspection.

Lasby and Lee concluded that their observations were sufficiently corroborative of Coppock's allegations to justify further investigation, so they sought a search warrant. Based on declarations submitted by Coppock and Lasby,[2] the magistrate

---

[2]The application for warrants included declarations of Coppock, Lasby, and Lee. The declaration of Lee was almost identical to that of Lasby, and in approving the inspection warrants the magistrate judge indicated reliance on the Coppock and Lasby declarations.

judge issued two inspection warrants authorizing DPH to search the houses located at 6418 and 6420 Brooklyn Avenue NE for evidence of rodent infestation. Specifically, the warrants authorized DPH to:

> [I]nspect the exterior, including but not limited to, common areas, yards, crawlspaces, porches, basements, attic and any out buildings, [and] appliances on the premises, specifically including inside the shack in the rear yard of the property that serves as a living unit.

> IT IS FURTHER ORDERED that you search inside the premises in areas where violations may exist, including but not limited to any individual dwelling units or apartments or rooms or other housing units that may exist inside the main building, cabinets, closets, under furniture, inside furniture, inside appliances, in common areas, storage spaces, basements, and attics.

The warrants ordered DPH to search for and to seize "evidence of violations of the Seattle Municipal Health Code . . . including photographs and any other evidence of filth, debris, rodent or insect infestation." The warrants authorized DPH to "obtain whatever assistance is necessary and proper under the circumstances."

DPH asked the Seattle Police Department to help execute the warrants "to protect the safety of [DPH] staff" during the search. DPH and the police were concerned that Ade might resist the search, given his previous refusal to admit Lasby and Lee. DPH and the police were also concerned because these boardinghouses were owned by Hugh Sisley, whose associate, Keith Gilbert, previously had threatened DPH employees during inspections of other Sisley properties. In light of Gilbert's violent criminal history, the police and DPH

considered the possibility that Gilbert might try to disrupt the inspection, or even assault a member of the inspection team.

On the morning of the inspection, DPH decided to search the houses sequentially, beginning with the house located at 6418 Brooklyn Ave. NE, because there were not enough police officers present to protect two inspection teams. Before DPH began to search the house located at 6418 Brooklyn Ave. NE, several Seattle police officers, including some members of the Anti-Crime Team, secured the house. After DPH completed the first inspection, police officers secured the other boardinghouse and DPH inspected it. Before both inspections, police officers gathered each building's tenants in one location, gave them copies of the inspection warrants, and told them why DPH was inspecting the houses.

When DPH and the police arrived, they approached Ade first and informed Ade that DPH had a warrant to inspect the boardinghouses for evidence of rat infestation. In his deposition supporting Plaintiff's opposition to summary judgment, Ade testified that when DPH and the police presented the inspection warrants to him, they did not give Ade time to read the warrants, saying that Ade would have time to read the warrants later. Although the officers' guns were in their holsters, the holster straps were "unsnapped."

According to Ade, the officers ordered Ade to accompany them and to unlock doors inside the house located at 6418 Brooklyn Ave., NE. The officers threatened to break down the doors if Ade did not comply. Ade testified that as the police officers secured the boardinghouse located at 6418 Brooklyn Ave NE, the officers drew their weapons, frisked the tenants, and "scream[ed] at them, 'Get up, get up, search warrant, get out of your room,' and stuff." But Ade also testified that "[Ade] didn't see [police officers], you know, ransacking people's rooms like they did." Defense counsel asked Ade whether he concluded that police officers searched his ten-

ants' rooms "based on what [Ade] saw after the fact," to which Ade answered "Yes."

After the police secured the boardinghouse located at 6418 Brooklyn Ave. NE, and during the inspection, which lasted approximately two hours, the police detained the building's tenants, including plaintiffs Sogga and Emry, in a secure room. Officer Bauer, who helped secure the boardinghouses, testified that the officers selected the room in which the officers held the tenants because "it was the only room that didn't have garbage in it. It was empty and it was big enough to — The other rooms were very, very tiny and this was the biggest space in the house."

In support of Plaintiffs' motion for summary judgment, plaintiff Emry testified by declaration that he woke up when he heard police officers "pounding" on the door to his room and that two police officers detained Emry as he exited his room in order "to pat me down against the wall and ask[ ] me about drugs and weapons." According to Emry, the police officers refused to let Emry drink a cup of coffee or smoke a cigarette. Instead, they "immediately" took Emry to the room in which the police were detaining the other tenants, where officers gave Emry a copy of the search warrant and asked Emry an unspecified "series of questions." Emry also testified that an officer in the detention room told Emry, Sogga, and the other tenants in the room, that they could not smoke unless they were "handcuffed to the front porch" and that they could "only go to the bathroom with a police escort." During Emry's deposition, which Defendants offered in support of summary judgment, Emry testified that he concluded that Seattle police searched his room because "[a]s I was being told [sic] whether or not I had drugs or weapons, the [officer] did a visual kind of glance over into my room." Defense counsel asked Emry whether he had any reason to believe that officers entered Emry's room or searched Emry's belongings, to which Emry responded "No, I guess not."

Plaintiff Sogga testified by declaration that she woke up when she heard the police make a "loud noise" entering the house, and that a police officer directed her to the detention room as soon as he saw her, at which point an officer gave Sogga a copy of the inspection warrant. Sogga also testified that "[a]n individual associated with the SPD took my information and entered it into a computer device." According to Sogga's testimony, about ninety minutes into the search, a police officer retrieved Sogga from the detention room and took her into the basement, where her room was located. An officer told "Sogga" that he had found drug paraphernalia in her room. In his deposition, which Defendants offered in support of summary judgment, Officer Carl Zylak, who helped secure the boardinghouse at 6418 Brooklyn Ave. NE, testified that: "Upon completion of searching the residence, I observed what appeared to be a ziplock baggie of suspected magic mushrooms in the room of Tenant Sogga . . . ." Zylack also testified that "[t]he magic mushrooms were seen in plain view." During her deposition, which Defendants offered in support of summary judgment, Sogga confirmed that there were magic mushrooms and drug paraphernalia in her room on the day of the inspection. Sogga testified that the mushrooms "were in a silver container on the table . . . ." The record does not indicate whether Sogga testified that the container was covered.

An officer placed Sogga under arrest "and read [Sogga her] rights." Sogga testified that police officers questioned her about what was in her room and that they referred to information contained in her "personal papers." Sogga also testified that: "The SPD Officers then told [sic] that I needed to sign a consent to search form for my room or I would go to jail. I asked if I could talk to a lawyer and they told [sic] I could talk to one from jail." Sogga signed the consent form and the police returned her to the detention room. When Sogga returned to her room after the tenants were released twenty minutes later, Sogga testified, it was "clear" that officers "had

thoroughly searched my entire room and contents," including an envelope containing "intimate photos" of Sogga.

DPH then searched the house located at 6420 Brooklyn Avenue NE. The police detained its tenants, including plaintiff Dawson,[3] in the backyard for the duration of the search, about forty minutes. Dawson testified by declaration that she tried to enter the boardinghouse located at 6418 Brooklyn Avenue NE while DPH was inspecting it, but the police would not let her enter. Dawson was "expecting the search" more than two hours after the inspection began at 6418 Brooklyn Ave NE, when police officers knocked on her door, "handed me a copy of the search warrant, asked if I had any drugs or weapons in my room and told me I had to go to the back of 6420." The officers refused to allow Dawson to remain in the room to observe DPH during the inspection. Dawson also testified that she "did not even get a chance to put on any shoes." When she reached the back yard, an officer asked Dawson for her identification, which was still in Dawson's room. An officer escorted Dawson back to her room, at which point "[Dawson] saw two SPD Officers apparently searching it." One officer was looking into Dawson's closet, while the other was "standing next to the table that contained [Dawson's] personal papers, jewelry making materials, and medication." The officer allowed Dawson to retrieve her identification, but not her shoes, even though, Dawson testified, there was broken glass "around the patio." The officers did not allow Dawson to walk to the corner fruit stand during the remainder of the inspection, which lasted "approximately one hour." Dawson testified that after the police released her, she returned to her room and found that "all my personal papers had been moved and arranged in a manner different than how I had them organized. The medication on my table had also been rearranged." Later, during Dawson's deposition, which Defendants offered in support of summary judgment, Dawson

---

[3]Plaintiff Foltz lived in the house located at 6420 Brooklyn Avenue NE, but he was not home at the time of the search, and he was not detained.

testified that she did not observe a police officer move her papers and that she does not know who moved them.

Although officers accompanied DPH during the searches to provide security and there was testimony that the officers conducted some searches of tenants' rooms incidental to providing security, the police did not conduct the inspection for rodent infestation. None of the residents was injured or transported from the boardinghouses to a police station. Neither search yielded much evidence that the boardinghouses were then infested by rats.

Sogga and Emry, residents of units at 6418, and Dawson and Foltz, residents of units at 6420, sought damages in this action under 42 U.S.C. § 1983, alleging that the search of their homes was unconstitutional because Lasby and Lee lacked probable cause when they applied for the inspection warrants and because the warrants were too broad. Plaintiffs also sought damages from King County for allegedly failing to train its employees regarding the proper standards for obtaining a search warrant. Finally, Plaintiffs sought damages from the City of Seattle for its alleged custom or policy that caused Plaintiffs to be unconstitutionally detained during the inspection.

On cross-motions for summary judgment, the district court dismissed Plaintiffs' suit against Lasby and Lee. The court concluded that probable cause existed to support a warrant to inspect the houses located at 6418 and 6420 Brooklyn Avenue NE for violations of the Seattle Municipal Code, so Plaintiffs were not deprived of any constitutional right. The district court also dismissed Plaintiffs' suit against King County because the court concluded that Plaintiffs were not deprived of any constitutional right. Finally, the district court dismissed Plaintiffs' suit against the City of Seattle because the court concluded that the detentions of Dawson, Sogga, and Emry were not unreasonable under the totality of the circumstances.[4]

---

[4]Because Foltz was not present during the inspection search, the district court concluded that he could not assert an unreasonable seizure claim.

Plaintiffs appeal the dismissal of their claims on summary judgment. The district court awarded costs to Defendants, which Plaintiffs also now challenge.

## II

We must decide whether health investigators Lasby and Lee, and by extension King County, violated Plaintiffs' Fourth Amendment rights by seeking and executing a warrant to search for evidence of rodent infestation and by detaining Plaintiffs during the search. We also must decide whether the City of Seattle is liable as a municipality for having a policy or custom that caused Plaintiffs to be detained unreasonably by the City of Seattle's police during the search of Plaintiffs' residences, in violation of the Fourth and Fourteenth Amendments. Finally, we must decide whether the district court abused its discretion in awarding costs to Defendants.

### A.

To establish a violation of 42 U.S.C. § 1983, Plaintiffs must prove that Lasby and Lee: (1) acted under color of state law, and (2) deprived Plaintiffs of their constitutional rights. *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs argue that Lasby and Lee violated their constitutional rights by executing impermissibly overbroad warrants unsupported by probable cause. The district court granted summary judgment to Lasby and Lee on the grounds that the inspection warrants met the probable cause standard for administrative warrants, that the warrants were not overbroad, and that Lasby and Lee were entitled to qualified immunity. Although we disagree with the district court that the inspection warrants should be reviewed under the less rigorous standard applicable to administrative warrants, we agree with the district court's ultimate conclusion that the warrants were supported by probable cause and were not overbroad.

[1] Seattle Municipal Code § 10.34 was enacted to prevent "the spread of infectious and contagious diseases and specifi-

cally the disease known as the 'Bubonic Plague' by rats, mice, and other rodents." Seattle Municipal Code § 10.34.010 (2004). The Code states that "[a]ll premises and places shall be maintained free from rats, mice, and other rodents; and it shall be unlawful for the owner or occupant thereof to fail to take such reasonable preventive and remedial measures for such purpose as shall be prescribed by the Director of Public Health." *Id.* § 10.34.030. These sections of the Code are criminal ordinances, a violation of which may be punished by a fine not to exceed $300, imprisonment not to exceed ninety days, or both. *See* Seattle Municipal Code § 10.34.040. Because DPH obtained criminal warrants to search the boardinghouses for violations of the Code, it was necessary for probable cause to support the warrants. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

a.   Probable Cause

**[2]** We review a magistrate judge's probable cause determination for clear error. *United States v. Wong*, 334 F.3d 831, 835-36 (9th Cir. 2003); *United States v. Hay*, 231 F.3d 630, 634 n.4 (9th Cir. 2000). We will not invalidate a search warrant "if the magistrate judge had a 'substantial basis' for concluding that the supporting affidavit established probable cause." *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994); *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994). In this context, probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place," based on the totality of circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause standard:

> [M]erely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" that certain items may be contraband or stolen property or useful as evidence of a crime; it

does not demand any showing that such a belief be correct or more likely true than false.

*Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation omitted); *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) ("[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (internal quotation marks omitted)).

**[3]** Here, Coppock's and Lasby's declarations created a "fair probability" that evidence of a crime would be found in 6418 and 6420 Brooklyn Avenue NE. Coppock's declaration suggested that these two houses deserved to be characterized as rat traps. He observed "rotting food," "rat urine," "rat feces," roaches and other bugs, as well as structural infirmities in both houses that would allow rats to enter them and to move about freely. He also observed piles of junk and debris located close to both houses in which rats could nest.

**[4]** The evidence considered by the magistrate, viewed as a whole, would permit a reasonable person to believe that a search of these houses had a fair probability of revealing evidence of serious Health and Safety Code violations. We hold that the warrants were supported by probable cause.

Plaintiffs urge, however, that Lasby's responses to their interrogatories indicated that he believed he was searching only for a violation of Seattle Municipal Code § 10.34.030.[5] Plaintiffs argue that Lasby could not have had probable cause to search the boardinghouses because, under the theory asserted by Plaintiffs, they could not have violated § 10.34.030, no matter what condition the boardinghouses

---

[5]Interrogatory No. 10 stated in part: "Identify the specific Seattle Municipal Health Code (SMC) ordinance and subsection you had probable cause to believe was being violated at 6418 Brooklyn Avenue N.E. on September 28, 1999 . . . ." Lasby responded by citing SMC § 10.34.030.

were in, unless Plaintiffs expressly disobeyed a preventive or remedial order from the Director of Public Health.

This argument fails. As the district court pointed out, these warrants generally authorized DPH to search for evidence of rodent infestation. Lasby's statement, made during discovery, years after the searches, cannot limit retroactively the justifications for these warrants that Watson, Lasby and Lee presented to the magistrate. *See United States v. Huguez-Ibarra*, 954 F.2d 546, 552 (9th Cir. 1992) ("In reviewing the magistrate's decision that probable cause existed, we are limited to the information contained within the four corners of the affidavits supporting the application for the search warrant."); *United States v. Brown*, 455 F.2d 1201, 1204 (9th Cir. 1972) ("In considering the validity of the search warrant, we are limited to the information and circumstances that were available to the magistrate at the time the warrant was issued.").

Plaintiffs' argument misinterprets Seattle Municipal Code § 10.34.030, which states: "[a]ll premises and places shall be maintained free from rats, mice, and other rodents; and it shall be unlawful for the owner or occupant thereof to fail to take such reasonable preventive and remedial measures for such purpose as shall be prescribed by the Director of Public Health." This ordinance was written in the conjunctive, and it must be interpreted to impose distinct duties on a building's owners and occupants: first, to maintain the building "free from rats, mice, and other rodents," and second, to comply with reasonable preventive and remedial measures issued by the Director of Public Health. As we have held, a statute is normally to be interpreted so that all of its words are given meaning and not rendered superfluous. *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1165 (9th Cir. 1999).

**[5]** Plaintiffs' argument fails, therefore, because probable cause existed to suspect a breach of the owner's first prescribed duty, even if there was no evidence that the owner had breached the second. It would be incorrect for us to interpret

this section of the City's Health and Safety Code, which was clearly intended to prevent the proliferation of rats and vermin, to allow a building to be overrun by rats until the Director of Public Health specifically commands otherwise. Stated another way, the ordinance prohibits maintaining premises that are infested by rodents, a prohibition necessary to avoid the hazards of rodent-caused plague and other serious diseases, and this prohibition can be violated without a failure to take administratively requested remedial action. Because there was probable cause that a search of the houses located at 6418 and 6420 Brooklyn Avenue NE would reveal evidence of a crime, one that posed health hazards of potentially epidemic proportions, the magistrate judge properly and permissibly issued warrants to search these properties.

b. Overbreadth

**[6]** A valid warrant must describe particularly the places that officers may search and the types of items that they may seize. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986); *Clark*, 31 F.3d at 836. This requirement exists to "prevent[ ] general, exploratory searches and indiscriminate rummaging through a person's belongings." *Spilotro*, 800 F.2d at 963.

Although "[t]he description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized," *Id.*, we have made clear that "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Id.*

Applying this standard, we have invalidated a warrant that authorized a search for "narcotic controlled substances, drug paraphernalia, marijuana cultivation equipment, instructions, notes, cultivation magazines, currency, documents, and records and fruits and instrumentalities of [a] violation of Title 21, U.S.C. § 841(a)(1)." *Clark*, 31 F.3d at 834. We con-

cluded that the phrase "fruits and instrumentalities of [a] violation of Title 21, U.S.C. § 841(a)(1)" did not indicate with sufficient particularity the items that officers could seize. And we observed that "anything, or [sic] any nature or description, deemed to be a fruit or instrumentality of the alleged crime [could be seized]." *Id.* at 836.

Similarly, in *Spilotro*, we invalidated a warrant that authorized a search for, among other things:

> [E]vidence of violations of 18 U.S.C. § 1084, 1952, 1955, 892-894, 371, 1503, 1511, 2314, 2315, 1962-1963, and which are or may be: (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

800 F.2d at 961. The warrant failed to distinguish between items that could be used lawfully and those that the government had probable cause to believe were part of the criminal enterprise at issue, and it "authoriz[ed] wholesale seizures of entire categories of items not generally evidence of criminal activity." *Id.* at 964. But we explained that the government could have cured the warrant's facial overbreadth either by describing the items it expected to find, or by describing the criminal activities of which it hoped to find evidence. *Id.*

**[7]** The warrants at issue here, by contrast, did describe the criminal activity of which the government hoped to find evidence, specifically evidence of rat infestation or evidence of living conditions so filthy as to invite such infestation. These warrants described exhaustively the places the magistrate judge authorized DPH to search. But more importantly, the warrants limited the items that DPH could seize to "any evidence [showing a violation of the Health and Safety Code],

including photographs and any other evidence of *filth, debris, rodent or insect infestation*." (emphasis added). Because the warrants specified the crime to be investigated, the specific places to be searched, and the types of evidence to be seized, they provided sufficient guidance to the health investigators executing the warrant. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Meek*, 366 F.3d 705, 715 (9th Cir. 2004) (concluding that a warrant listing items including "photography equipment" and "paraphernalia used to lower the inhibition of children" was sufficiently specific because "all items listed in the warrant were limited to materials related to 'sexual exploitation of a child.' "); *see also Spilotro*, 800 F.2d at 963 (laying out a standard to measure the specificity of a warrant). We conclude that the warrants were not constitutionally overbroad, and that they satisfied the Fourth Amendment's requirement to specify particularly the places that officers could search and the items that they could seize. The health investigators had sufficient guidance that they were searching for evidence of "filth, debris, rodent or insect infestation" as specified in the warrants, and the residents had fair notice of the object of the search.

**B**

**[8]** A municipality is liable for the constitutional torts of its employees under § 1983 where its "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Plaintiffs urge that Lasby and Lee searched the boardinghouses in violation of the Fourth and Fourteenth Amendments, and that King County is liable for this search because the County did not teach Lasby and Lee a constitutionally valid search and seizure method.

**[9]** Because we conclude that Lasby and Lee's search did not deprive Plaintiffs of any constitutional right, however, Plaintiffs cannot, as a matter of law, establish a valid § 1983

claim against King County. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).**⁶**

## C

Plaintiffs contend that the City of Seattle is liable because its officers, pursuant to an official policy, unreasonably detained Plaintiffs while DPH searched the houses located at 6418 and 6420 Brooklyn Avenue NE. The district court assumed for purposes of its analysis that the Seattle Police Department follows a policy of detaining a building's occupants whenever officers conduct an involuntary search. Nonetheless, the district court concluded that Plaintiffs' detentions were constitutionally permissible as a matter of law, and granted summary judgment to Defendants. On appeal, Plaintiffs challenge the district court's conclusion and assert that their detentions were unreasonable and therefore unconstitutional.

[10] The Supreme Court's precedents, and our own, establish that the police may detain a building's occupants while officers execute a search warrant as long as the detention is reasonable. *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981) ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of privacy is justified, it is constitutionally reason-

---

**⁶**Alternatively, even if we were to assume that the search was unconstitutional, Plaintiffs did not offer any evidence that King County's alleged failure to train Lasby and Lee caused the assumed unconstitutional search. *See Canton*, 489 U.S. at 390 (requiring that, as a prerequisite for municipal liability, the failure to train "actually causes injury"). Coppock informed the city and county that the conditions inside the houses located at 6418 and 6420 Brooklyn Ave. NE suggested that they were infested with rats or had conditions that would cause infestation. Lasby and Lee responded by consulting with an Assistant City Attorney and then seeking a warrant from a judicial officer. Plaintiffs presented no evidence that Lasby and Lee would have acted differently if King County had provided more particularized training on the Fourth Amendment and search procedures. *See id.*

able to require that citizen to remain while officers of the law execute a valid warrant to search his home."); *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir. 2003) (concluding that it was reasonable to detain a business's employees while officers searched the business's premises pursuant to a warrant). To determine whether a detention incident to a search is constitutionally reasonable, we balance the law enforcement interests served by the detention against the public's privacy interests. *Ganwich*, 319 F.3d at 1120. Since *Summers*, we have recognized that detaining a building's occupants serves at least three law enforcement interests: first, detention prevents a suspect from fleeing before the police discover contraband; second, detention minimizes the risk that an officer or an occupant might be harmed during the search; and third, detention often expedites a search. *Summers*, 452 U.S. at 702-03; *Ganwich*, 319 F.3d at 1120.

**[11]** Whatever previously may have been thought to bear on the reasonableness of a detention incidental to a search, the United States Supreme Court recently held that "[a]n officer's authority to detain incident to a search is *categorical*; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' " *Muehler v. Mena*, 125 S. Ct. 1465, 1470 (2005) (emphasis added). We interpret the Supreme Court's language to mean that the duration of a detention may be coextensive with the period of a search, and require no further justification. The police do not, however, have unfettered authority to detain a building's occupants in any way they see fit. *Id. Muehler* confirms an officer's authority to detain a building's occupants during a search so long as the officer conducts the detention in a reasonable manner. Thus, the Seattle police could permissibly detain Plaintiffs while DPH searched the boarding-houses for evidence of rat infestation.

Plaintiffs, however, contend that *Muehler* and *Summers* apply only to searches for contraband, rather than searches for evidence, like the search underlying this case. We reject this

argument for two reasons. First, in *Ganwich*, we applied *Summers* in the context of a search for evidence of a criminal violation, that of consumer fraud, not a search for contraband. *Ganwich*, 319 F.3d at 1120. *Ganwich* involved a search for evidence of conduct by a business that was deceptive or unfair to consumers; contraband was not at issue in the search. Plaintiffs' argument is inconsistent with our Circuit law, and our panel is not at liberty here to overrule a prior decision of this Court. *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005) (noting that "a three-judge panel may not overrule [9th Circuit precedent] absent intervening Supreme Court or en banc authority"). Also, *Muehler* itself involved a search for both evidence and contraband, not solely a search for contraband. *Muehler*, 125 S. Ct. at 1468 ("Muehler obtained a search warrant . . . that authorized a broad search of the house and premises for, among other things, deadly weapons and evidence of gang membership."). Thus, the doctrine of *Michigan v. Summers*, permitting police officers to detain individuals during a search, and the principle of *Muehler*, holding that the authority to detain incident to search is categorical, apply to all searches upon probable cause, not just to searches for contraband.

**[12]** Even apart from *Muehler*'s endorsement of an officer's categorical authority to detain a building's occupants while the officer searches it, here the law enforcement interests in safely and effectively conducting these searches of the boardinghouses for rodent infestation amply justified the police to detain Plaintiffs during the search. *See Summers*, 452 U.S. at 705. These officers were conducting a search for a serious public health hazard, against the property manager's will, pursuant to a valid warrant. The occupants conceivably might have wanted to help the DPH inspectors to identify health code violations in their own interests. But they also might have fled, rendering themselves unavailable to answer questions pertinent to the search. Or they may have impaired the search rather than assisted it, under the mistaken assump-

tion that the police were there to investigate Plaintiffs rather than the owner and property manager.[7]

The owner of these boardinghouses was associated with a man who not only had a violent criminal history, but who previously had threatened DPH employees concerning the officials' inspections of the landlord's properties. Also, the police did not know exactly how many people were inside the boardinghouses, or the identities of those who were living there or what other visitors might pose dangers. Allowing an unknown number of unidentified people to move about unsupervised during an involuntary inspection would dramatically increase the likelihood that an occupant could injure or kill an officer, or that an officer might mistakenly injure an occupant. As the Supreme Court said in *Summers*, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers*, 452 U.S. at 702-03. Moreover, this salient principle is only reinforced by *Muehler*'s explanation that the authority to detain pending search is "categorical." *Muehler*, 125 S. Ct. at 1470.

[13] We conclude that the detaining of Plaintiffs and the manner of Plaintiffs' detentions were constitutionally permissible.[8] Resolving all factual disputes in favor of the nonmoving

[7]Plaintiffs contend that Defendants overstated the officers' and health investigators' safety concerns, but Plaintiffs submit no evidence to counter the testimony submitted by Defendants that the officers were concerned for their safety because they were conducting an involuntary search of two buildings housing an unknown number of residents, with a possibly hostile landlord. At deposition, Officer Hope Bauer testified that the police detained Plaintiffs to ensure "officer safety" in light of "a history of problems with associates of the landlord," specifically Keith Gilbert. Bauer testified that "[Gilbert] would be in the vicinity or at the inspections of any house in the area that belonged to Hugh Sisley and I was told he had caused problems and either attempted or assaulted one of the inspectors." Officer Carl Zylak also testified that the officers detained Plaintiffs "for safety reasons."

[8]On appeal, Plaintiffs have contended that their detentions violated the Fourth Amendment. We address whether the Seattle police had authority

party, as we must when we review an order granting summary judgment, the record does not indicate a genuine issue of material fact whether the detaining of Plaintiffs and its manner were constitutionally impermissible. In *Muehler*, the Supreme Court held that "Mena's detention in handcuffs for the length of the search was consistent with our opinion in *Michigan v. Summers*, and that the officers' questioning during that detention did not violate her Fourth Amendment rights." *Muehler*, 125 S.Ct. at 1468 (citations omitted). In *Muehler*, an agent of the Immigration and Naturalization Service (INS) accompanied the police officers who detained Mena. *Id.* The INS agent asked Mena and other detainees several questions, including her immigration status, name, and place of birth; the agent also asked each detainee to produce immigration documentation. *Id.* The Supreme Court made clear in *Muehler* that questioning a person whom the police detain incident to a building search does not require independent probable cause because "mere police questioning does not constitute a seizure." *Id.* at 1471 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The Supreme Court rejected the notion that questioning a detainee "constitute[s] a discrete Fourth Amendment event," unless the questioning prolongs the detention. *Id.*

---

to detain Plaintiffs pending search of the boardinghouses, and whether the manner of that detention was constitutionally reasonable. We do not here assess the same issues that might be considered had a search of a tenant's room yielded evidence that was later the subject of a motion to suppress in a criminal case. Apart from the decision to detain and the manner of detention, other police conduct that might raise a constitutional question in an appropriate case is not before us.

Moreover, even if we could consider police conduct unrelated to the manner of detention, Appellants' claims of police misconduct dismissed on summary judgment were claims for damages against the City of Seattle and the Chief of Police, not claims against the individual police officers who had engaged in the alleged misconduct. Plaintiffs have not shown that there was a policy or practice of the City of Seattle that caused any violation of right by individual officers. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-694 (1978).

**[14]** The Supreme Court also declared: "Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* at 1470. In *Muehler*, a SWAT team, wearing helmets and black vests, woke Mena from her bed and placed her in handcuffs at gunpoint. *Id.* at 1468. Turning the focus back to the appeal before us, the manner in which the Seattle police secured the boardinghouses was not more intrusive than the manner in which the police entered Mena's residence, and police had reason to be concerned about safety. In *Muehler* the police were investigating a driveby shooting and the police were concerned that they might encounter one or more armed gang members. Here, there were parallel concerns about possible violence because the Seattle police had reason to think that Keith Gilbert might try to prevent the DPH inspection by violently resisting or attacking the DPH inspection team or their police escorts. Under these circumstances, it was reasonable for the police to enter the boardinghouses aggressively and drawing their sidearms, as was indicated by Plaintiffs' testimony, would not render the detention unreasonable. Further, it was not unreasonable immediately to gather and detain Plaintiffs and the other tenants, even when we credit Plaintiffs' testimony that some officers yelled at Plaintiffs during the process. Nor is the manner of detention rendered unreasonable if police did not permit tenants to pause for cigarettes or coffee; to the contrary, it was reasonable to assemble tenants in a suitable place at the earliest practical opportunity in order to facilitate the inspection and its completion. Particularly in light of the Supreme Court's recent guidance in *Muehler*, Plaintiffs have not identified a genuine issue of material fact whether the decision to detain Plaintiffs and the manner of the Seattle police officers' entry into the boardinghouse located at 6418 Brooklyn Ave. NE was constitutionally impermissible. Nor have Plaintiffs raised a genuine material factual issue about the manner of the officers' entry into the boardinghouse located at 6420 Brooklyn Ave. NE, because nothing in the record suggests that the

police entered the boardinghouse at 6420 Brooklyn Ave. NE in an improper way.

The manner in which the police officers detained Plaintiffs was reasonable under *Ganwich* as well. In *Ganwich*, we concluded that "although it was reasonable to detain the plaintiffs on the Ear-Tec premises during the search of the building, it was not at all reasonable to condition the plaintiffs' release on their submission to interrogation." *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir. 2003). The police officers who detained Ganwich and the other Ear-Tec employees "told the plaintiffs . . . that they would not be released until they submitted to individual interrogations. *Id.* at 1121. But here, nothing in the record suggests that the police conditioned Plaintiffs' release from detention on Plaintiffs' willingness to submit to an interrogation. All of Plaintiffs' declarations indicate that the police released Plaintiffs as soon as DPH finished inspecting the boardinghouses.

**[15]** Also, the questions the officers allegedly asked Plaintiffs were related to a primary justification for detaining Plaintiffs, which was to secure the safety of the inspecting health officials and the police officers. The record indicates that the officers questioned Plaintiffs as they went from room to room in order to secure the boardinghouses. Given the officers' concern for their safety and the safety of DPH personnel, it was reasonable for the officers to ask Plaintiffs whether Plaintiffs' rooms contained weapons, which would pose a risk to the officers and inspection officials; or to ask whether any of the plaintiffs was the subject of an outstanding warrant, to ascertain which of the detainees might pose an increased threat of violence; or to ask whether Plaintiffs' rooms contained narcotics, which might render Plaintiffs more violent or less likely to allow the DPH inspectors' lawful presence.

**[16]** Denying Plaintiffs' requests to smoke or to use the bathroom unattended was also permissible. In *Ganwich*, "the officers prevented the plaintiffs from leaving the waiting

room, from going to the restroom unattended, from retrieving their personal possessions, from making telephone calls, and from answering the office telephone when it rang," for between one hour and forty-five minutes and four hours and forty-five minutes. *Id.* at 1118. There, we held the police conduct unreasonable in part because "depriving the plaintiffs of telephone access [was not] justified by legitimate law enforcement interests for more than a fraction of the detention." *Id.* at 1123. But here, denying Plaintiffs' requests to smoke and to use the restroom unattended furthered the officers' interest in facilitating an efficient inspection by DPH personnel. In his deposition, which Plaintiffs offered in opposition to summary judgment, Lasby testified that DPH requested that police officers accompany DPH personnel while DPH inspected the boardinghouses "to cover in case we missed anybody and staff could end up in a situation where there would be an angry confrontation so for safety and to let us concentrate on our jobs, [police officers] accompanied us." A tenant left unsupervised to use the restroom, or to smoke, could retrieve a weapon and assault an officer or a member of the DPH team. And once the health inspectors commenced their inspection, if a police officer escorted a tenant, leaving an inspector unguarded might have exposed that inspector to the risk of attack from any angry tenant who had evaded the officers' initial security sweep. We conclude that the officers' decision to deny Plaintiffs' requests did not render the manner of Plaintiffs' detentions constitutionally impermissible.

For purposes of summary judgment, we accept Dawson's allegation that the police would not permit her to retrieve her shoes, even though there was glass on the floor of the area in which the police detained her. Without more, however, we cannot say that this fact is enough to render the manner of Plaintiffs' detentions constitutionally impermissible. In her declaration, Dawson testified that she wanted to get her shoes because there was glass around the patio "and because I wanted to be able to walk to the corner fruit stand." Dawson does not allege, or offer evidence to prove, that the officers

who detained Dawson were aware that there was broken glass on the patio. Nor does the record suggest that the amount of glass on the patio presented such a risk of injury to Dawson during her detention in the backyard that it was constitutionally unreasonable for the police to deny Dawson's request to get her shoes. Allowing Dawson to retrieve her shoes might have frustrated the DPH inspection to the extent that other tenants might have similarly requested access to their rooms to retrieve items that they wanted. Because there is no evidence in the record to suggest that the glass on the patio created an unreasonable risk of injury to Dawson and that the officers were aware of that risk, we conclude that the officers' decision to deny Dawson's request to retrieve her shoes did not render the manner of Plaintiffs' detentions constitutionally impermissible.

**[17]** This detention aided a lawful search conducted pursuant to valid warrants supported by ample probable cause. The officers had reason to be concerned about the health inspectors' safety and their own. The officers permissibly questioned Plaintiffs whether their rooms contained drugs or weapons. The manner of Plaintiffs' detentions was commensurate with the potential threat that not merely the tenants, but also the landlord and his associates posed to the officers and inspectors. And the detentions of the tenants did not last longer than necessary to conduct the search, as the police released Plaintiffs as soon as DPH completed each search. Nor did the police condition Plaintiffs' release from detention on Plaintiffs' submission to interrogation, as did the officers in *Ganwich*. *Ganwich*, 319 F.3d at 1122. We conclude that Plaintiffs' detentions were constitutionally permissible.

## D

**[18]** We turn to the issue of costs. We review for abuse of discretion a district court's award of costs. *Miles v. California*, 320 F.3d 986, 988 (9th Cir. 2003). Under Federal Rule of Civil Procedure 54(d), there is a presumption that the pre-

vailing party will be awarded its taxable costs. *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003); Fed. R. Civ. P. 54(d)(1) ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."). To overcome this presumption, a losing party must establish a reason to deny costs. *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1079 (9th Cir. 1999). Here, the district court awarded costs to Defendants, who prevailed.

Defendants urge that we should not reach the issue of costs because Plaintiffs neglected to challenge the district court's award of costs in their Notice of Appeal. *See* Fed. R. App. P. 3(c)(1)(B) ("A notice of appeal . . . must designate the judgment, order, or part thereof appealed from."); *see also Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988) (holding that a court "may not waive the jurisdictional requirements of [Fed. R. App. P.] 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met"); *Vernon v. Heckler*, 811 F.2d 1274, 1276 (9th Cir. 1987) (holding that the Ninth Circuit lacks jurisdiction over appeals that give untimely or improper notice). But our case law allows a party to contest an award of costs on appeal even if the notice of appeal did not raise the issue expressly. *See Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*, 948 F.2d 556, 567 (9th Cir. 1991) (ruling on a challenge to taxation of costs despite the order not being mentioned in the Notice of Appeal and holding that the Notice of Appeal "from the judgment incorporates the appeal of the denial of the motion to retax costs"). We hold that Plaintiffs' Notice of Appeal from the district court's adverse judgments incorporates Plaintiffs' present appeal of the district court's decision to award costs to Defendants.

**[19]** Turning to the merits, Plaintiffs have not established that the district court abused its discretion by following the presumption raised under Federal Rule of Civil Procedure 54(d). Plaintiffs contend that the district court should not have awarded costs to Defendants because Defendants misrepresented two facts in their joint motion in limine: first that

Defendants timely served Plaintiffs with Requests for Admission on May 8, 2003; and second, that Plaintiffs did not contest their obligation to respond to the Requests. In fact, Plaintiffs did object to Defendants' Requests because the Requests were served on May 14, 2003, which was not timely. Defendants have responded that while preparing their motion in limine, Defendants relied on the date stamp indicating when Plaintiffs received a copy of the Requests, which incorrectly read May 8, 2003. Defendants admitted an error and explained their view of the reason for it, when Defendants received Plaintiffs' opposition to Defendants' motion in limine. We conclude that whether it may have been a mistake or rather could be considered "misconduct," Defendants' conduct was harmless because the district court never ruled on Defendants' motion in limine. Under all of the circumstances presented, we hold that the district court's decision to award costs to Defendants over Plaintiffs' objection was within the Court's discretion. *See Nat'l Info. Servs. v. TRW, Inc.*, 51 F.3d 1470, 1472 (9th Cir. 1999) ("A district court therefore generally must award costs unless the prevailing party is guilty of some fault, misconduct, or default worthy of punishment."), *overruled on other grounds by Ass'n of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000).

Thus, the district court's conclusions regarding all of the issues presented by this appeal are:

**AFFIRMED.**

---

B. FLETCHER, Circuit Judge, specially concurring:

Although I concur in the result reached in the majority opinion and in sections II.A., II.B. and II.D., the opinion's analysis of claims against King County, I cannot concur in section II.C. dealing with the liability of the City of Seattle. I disagree with the majority's reasoning in that section of the

opinion and offer an alternate, taking as true the Plaintiffs' (non-moving parties') assertion of the facts, as the basis for deciding these claims. The police officers' search of boarders' rooms was not reasonable within the meanings of *Ganwich* and *Muehler*. However, since the suit is against the City, not the individual officers, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), controls. Plaintiffs have not shown that the Seattle Police Department's policies or training caused the alleged deprivation of their civil rights.

In the majority opinion, the preamble to Section II accurately reflects the issues that we must decide in this appeal. As to the City of Seattle, the issue is "whether the City of Seattle is liable as a municipality for having a policy or custom that caused Plaintiffs to be detained unreasonably by the City of Seattle's police during the *search* of Plaintiffs' residences, in violation of the *Fourth* and *Fourteenth* Amendments." Majority at 941 (emphasis added). We need not determine, as the majority opinion does, whether or not the conduct of the police officers in their detention of the Plaintiffs was constitutional in all its aspects. Because the posture of the appeal requires us to accept as true all of Plaintiffs' assertions, there are material issues of fact that make such a conclusion impermissible.

## I.   *Monell* Entitles the City of Seattle to Summary Judgment

Despite serious concerns about the conduct of the police, this case cannot survive summary judgment. Plaintiffs did not name in their cause of action the individual police officers who searched their rooms and violated their rights. Rather, Plaintiffs pleaded a case of municipal liability, claiming that the City of Seattle and its police chief were liable for their policies concerning detentions incident to search warrants and for their failure to properly train police officers to conduct those detentions. And so, Plaintiffs' claims are controlled by *Monell,* 436 U.S. at 691-692. To survive summary judgment, there must be a genuine dispute of material fact as to whether

there was a (1) policy or practice that (2) caused (3) a violation of plaintiffs' rights. *Id.* at 692.

Although, Plaintiffs have demonstrated at least a dispute of fact as to whether there were violations of plaintiffs' rights during the execution of the search warrant, they have failed to show that a policy of the City of Seattle or Seattle Police Department caused these violations. Roman Welyczko, an attorney with DPH, testified in his deposition that while DPH does not have a formal, written policy that police accompany inspectors on every inspection warrant, "the expectation of the department and what I have consistently communicated to staff is to have police accompaniment for reasons of safety and security." ER 204. In his deposition, Seattle Police Captain Kessler indicated that "generally, yes, we would detain people when we're in the middle of a search warrant of any kind. That's a basic officer's safety premise." ER 252. There is evidence, therefore, that both DPH and SPD have policies or customs concerning police accompaniment of DPH inspectors and detention incident to a search warrant for safety reasons.

Plaintiffs argue, however, that DPH and SPD failed to train their employees in how to execute the departments' respective policies, but the record does not support this contention. The relevant issue here is not the training of DPH inspectors, but rather the training of police officers, who are responsible for the seizure and detention of the residents incident to implementation of a search warrant. According to Captain Kessler, SPD training as to detentions varies from situation to situation; officers have been trained to handle such detentions; and training is ongoing to assure that the detentions are executed in a constitutional manner. Plaintiffs do not refute this evidence of training and fail to create a genuine dispute of material fact as to whether the policies of the Seattle Police Department caused the violation of Plaintiffs' rights. Summary judgment in favor of defendants is, therefore, appropriate under *Monell.*

II.   The Police Officers' Searches

Because this case presents an appeal from cross motions for summary judgment in which the district court granted summary judgment in favor of defendants, our review must be *de novo* and we must view the evidence in the light most favorable to plaintiffs to the extent that there is factual dispute. *Am. Bankers Assoc. v. Gould*, 412 F.3d 1081, 1085-86 (9th Cir. 2005). The majority cites this standard, Majority at 932, n.1, 951-52 but fails to apply it.

The majority considers only whether the police had the authority to detain the residents and whether that detention was reasonably conducted, stopping short of considering the actual searches. It concluded that "[a]part from the decision to detain and the manner of detention, other police conduct that might raise a constitutional question in an appropriate case is not before us." Majority at 951-52, n.8. Somehow the majority erroneously thinks that the fact that this case does not concern a motion to suppress evidence found during the searches bars us from considering whether the searches violated Plaintiffs' rights.

A.   Searching Beyond the Warrant

The majority relies on *Muehler v. Mena, Michigan v. Summers*, and *Ganwich v. Knapp*[1] to describe the limits within which police have authority to detain incidental to executing a search warrant. *Muehler* held that the police "authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v. Mena*, 125 S. Ct. 1465, 1470 (2005) (internal quotation marks omitted). The majority derives from this trio of cases its position that "the duration of a detention may be coextensive with the

[1]125 S. Ct. 1465 (2005); 452 U.S. 692 (1981); 319 F.3d 1115 (9th Cir. 2003).

period of a search, and require no further justification" as long as that detention is conducted in a reasonable manner. Majority at 949.

All that may be true, but a "reasonable detention" does not allow search for items beyond those authorized by the warrant. Nor does it allow for detention beyond that necessary to conduct the authorized search (for evidence of health code violations, in this instance).[2]

---

[2]The warrant obtained by DPH inspectors to search 6418 Brooklyn Ave NE reads as follows:

> The Seattle-King County Department of Public Health has applied for a Health Code Inspection Warrant to conduct a health code inspection of the premises at 6418 Brooklyn Ave NE, Seattle, Washington 98115, including the shack in the rear yard, other outbuildings on the premises and any and all housing units that may be contained therein. . . .
>
> NOW, THEREFORE, you are hereby commanded to enter the premises at 6418 Brooklyn Ave NE, Seattle, Washington to inspect the exterior, including but not limited to, common areas, yards, crawlspaces, porches, basement, attic and any out buildings, appliances, on the premises, specifically including the shack in the rear yard of the property that serves as a living unit.
>
> IT IS FURTHER ORDERED that you search inside the premises, including the shack in the rear yard, in areas where violations may exist including but not limited to, any individual dwelling units or apartments or rooms or other housing units that may exist inside the main building, and in the main building and in the shack, in cabinets, closets, under furniture, inside furniture, inside appliances, in common areas, storage spaces, basements and attics.
>
> IT IS FURTHER ORDERED that you search for evidence of violations of the Seattle Municipal Health Code and seize any evidence of such violations, including photographs and any other evidence of filth, debris, rodent or insect infestation. . . . The purpose of the inspection is to discover violations of the Seattle Municipal Health Code. . . . You may obtain whatever assistance is necessary and proper under the circumstances.

*Muehler* and *Ganwich* permit a detention incident to the execution of a search warrant, to protect the officers and inspectors executing that warrant. These cases do not support a search for items outside the scope of the warrant — in essence, a search incident to the detention. It was "reasonable" for the police to detain the residents in a single room while the DPH inspectors executed their search warrant. It was "reasonable" to frisk the residents at the outset of that detention. It was not "reasonable" to question boarders as to whether there were drugs or weapons in their rooms or to search their rooms for drugs or weapons as part of this detention. Such searches are insupportable under *Muehler* and *Ganwich*. The majority argues that questioning about drugs is "reasonable" because knowing whether the detained residents are drug users will alert the police to their potential for violent behavior; the majority reasons that knowing whether there are weapons present in boarders' rooms is "reasonable" to protect police officers and DPH inspectors. Majority at 954. The majority's opinion allows not just the "reasonable" detention of the residents incident to the execution of the inspection warrant, as permitted by *Ganwich* and *Muehler*, but also the warrantless search for drugs and weapons, drugs and weapons from which the residents were physically isolated by virtue of their detention. The officer, inspector, and resident safety justifications cannot be supported on this basis. Permission for the search incident to detention here expands *Ganwich* and *Muehler*, unjustifiably, and runs roughshod over the Fourth and Fourteenth Amendments in the process. I cannot support it.

Contrary to the majority's view of the evidence, that the police simply accompanied DPH personnel during their search to provide continued security, taking the evidence in the light most favorable to Plaintiffs indicates that the police were themselves involved in searching for things outside the scope of the warrant.

As the majority opinion indicates, Plaintiff Shelly Sogga testified by declaration that about an hour and a half into the

inspection of 6418, a police officer escorted her from the detention room. She was taken to the basement bathroom where that officer told her that he had found drug paraphernalia in her room. Sogga was placed under arrest and read her rights. The police continued to question Sogga about the contents of her room, and in so doing, referred to a letter from her mother, which Sogga believed the police had read. The police told her to sign a consent form. When she asked to speak to a lawyer, the police told her that she "could talk to one from jail" and said that, if she refused to give her consent, she would go to jail. Sogga's Affidavit. She signed the consent form. When she was allowed to return to her room twenty minutes later, she found that the police had searched her entire room, rifling through personal papers and leaving intimate photos in full view.

The majority distinguishes this case from *Ganwich v. Knapp*. Not so! Sogga's story evokes the very issues upon which Judge Gould rested his opinion in *Ganwich v. Knapp*, where the police detained employees in a waiting room and did not release them until they consented to interrogation. 319 F.3d 1115, 1120-1121 (9th Cir. 2003). While the majority may argue that finding the drug paraphernalia gave the police probable cause to question Sogga, it is not clear how the police came upon this drug paraphernalia. The majority cites Officers Jamieson's and Zylack's police report which states that "[d]uring the search of the premises, several items of narcotics paraphernalia were observed in plain view by officers in a room that is occupied by S/Sogga." SPD Incident Report, Sept. 30, 1999. Sogga testified that the magic mushrooms were in a silver container on the table. Sogga Deposition at 84, June 9, 2003. The standard of review, requiring us to take the facts in the light most favorable to plaintiffs, is determinative here. We must credit Sogga's version of the facts, in which the police had read through a personal letter from her mother, indicating that they were searching, not simply clearing the rooms of people to make them safe, and in which the magic mushrooms were in a container. Viewing the facts in

the light most favorable to plaintiffs, the police were engaged in searching beyond the scope of the warrant; at the least, there is a genuine question of fact on this issue.

Plaintiff Jeri Dawson, a resident of 6420, testified by declaration that the police knocked on her door and told her to proceed to the back yard. She was not given time to put on her shoes. Once she reached the back yard, a police officer asked for her identification, which she had left in her room; the officer escorted her back to her room to retrieve her identification. When she entered her room, she found two SPD officers "apparently searching it." Dawson Affidavit. One "appeared to be looking into [her] closet and the other was standing next to the table that contained [her] personal papers, jewelry making materials, and medication." Again, the police did not permit Dawson to put on shoes, despite the presence of broken glass near the patio where she would be detained. When the inspection of 6420 ended and Dawson was permitted to leave the back yard, she returned to her room to find that all of her personal papers had been rearranged, as had her medications.

Once the police had determined that no one was left in the rooms, they had finished the search necessary to effectuate the detention of residents that would protect DPH inspectors, SPD officers, and the residents. At that point, the warrant gave DPH Inspectors authority to search for the items specified in the warrant. Continued SPD searches of individual boarders' rooms for other than the items listed in the warrant was a violation of their constitutional rights. The majority's justification for searches for weapons and drugs is not supportable under *Muehler* or *Ganwich*.

B. The Detention was Not "Coextensive" With the Execution of the Search Warrant

Furthermore, Plaintiffs' version of the facts, which we must credit, does not support the majority's conclusion that "the police released Plaintiffs as soon as DPH finished inspecting

the boardinghouses." Majority at 954. Plaintiffs argue that the detention of the residents of 6418 was not "coextensive" with the DPH inspectors' execution of their warrant. DPH Inspector Lasby testified that the detention of residents continued, and police continued to search the premises, after the DPH inspectors had completed execution of their inspection warrant. Lasby testified that he went with "the entire staff" to get a cup of coffee in between the inspections of 6418 and that of 6420; they were gone for twenty to thirty minutes. Upon returning, they had to wait for the police to "finish 6418." Lasby Deposition at 98, June 2, 2003. Mr. Lasby believed that the police had "gotten their own search warrant and were completing work on that." *Id.* at 99. In fact the police had no such warrant.

Plaintiff Sogga's statements indicate that the extension of the detention was due to the police search of her room. The majority may argue that this extension was permissible, although outside the scope of *Muehler,* because the police had probable cause for their search of Sogga's room for drug paraphernalia, but any such determination is based on disputed facts. What is clear is that the police officers' continued search (1) was for items not covered by DPH's search warrant and (2) extended the detention of 6418's residents such that it was no longer coextensive with the execution of the warrant. *See Muehler v Mena*, 125 S.Ct. 1465, 1470 (2005) ("Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search."). In contrast to *Muehler*, where the warrant authorized a broad search of the house for weapons and evidence of gang membership, *id.* at 1468, the warrant before us was specific, limiting the search to health hazards such as rat droppings.

Police searches incident to detention and the inconsistency between the duration of the detention and the length of the authorized inspection brings the issue of conduct of those

police officers before us and brings into question the majority's justification for ending their analysis with a justification for the detention and its reasonableness. *See Ganwich*, 319 F.3d 1121, n.9 ("The detention of building occupants during the execution of a search warrant may become unreasonable if it lasts too long. We cannot tell whether the detention during the execution of the warrant was too long in this instance, as the officers did not limit their activities to executing the warrant."). The majority's inquiry should have encompassed what happened once the residents of these two boarding houses were safely detained, the extent to which there was questioning about and searching for things outside the scope of the warrant and their detention after the authorized search was completed. The majority's decision not to address these questions implicitly condones police behavior which is deeply troubling.

III. Conclusion

Crediting Plaintiffs' version of the facts, as we must, Seattle police officers searched the rooms of the residents of 6418 and 6420 for items outside the scope of the warrant. This search went beyond what is reasonable under *Ganwich* and *Muehler*. The search and detention exceeded what was necessary to guarantee the security and safety of the DPH inspectors, the police officers, and the residents, and beyond what the warrant under which they had authority to search permitted. Once boarders had been frisked and detained in a single room, the house was secure. There was no need for the police to undertake further searches. However, because *Monell* controls here, I reach the same result as the majority, that we should affirm the district court's grant of summary judgment to defendants, but we should not condone the alleged misconduct of Seattle police officers.