# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPHRAIM TEKLE, a minor, by and
through his Guardian Ad Litem,
LILY TEKLE,

        *Plaintiff-Appellant,*

        v.

UNITED STATES OF AMERICA; GARO
TOROSSIAN; KEITH BODEN; CHARLES
MCCALMONT; THOMAS JANKOWSKI;
DAVID M. HAWKES, all agents and
employees of the Internal Revenue
Service, an agency of the United
States of America,

        *Defendants-Appellees.*

No. 04-55026

D.C. No.
CV 01-03894
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
October 19, 2005—Pasadena, California

Filed August 11, 2006

Before: Andrew J. Kleinfeld, A. Wallace Tashima, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Tashima;
Concurrence by Judge Kleinfeld

## COUNSEL

A. Clifton Hodges, Hodges and Associates, Pasadena, California, for the plaintiff-appellant.

Frank M. Travieso, Assistant United States Attorney, Los Angeles, California, for the defendants-appellees.

## OPINION

TASHIMA, Circuit Judge:

Ephraim Tekle ("Tekle"), a minor, by and through his mother and guardian ad litem, Lily Tekle, filed a complaint against the United States and various individuals, seeking declaratory relief and damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, and for alleged civil rights violations, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The complaint stemmed from an incident at Tekle's home when federal agents arrested Tekle's parents. The district court granted summary judgment in favor of the individual defendants on the basis that they did not violate Tekle's constitutional rights and that, even if they had, they were entitled to qualified immunity. Because the liability of the United States was derivative of the liability of the individual defendants, the court also granted summary judgment in favor of the United States. Tekle appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## BACKGROUND[1]

---

[1]"Because this case arises in the posture of a motion for summary judgment we are required to view all facts and draw all reasonable inferences in favor of the nonmoving party," in this case, Tekle. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam); *see also Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (en banc) (accepting the plaintiffs'

In 1998, Tekle's parents, Solomon and Lily Tekle, were suspected of narcotics trafficking and tax-related offenses. Internal Revenue Service ("IRS") Special Agent Thomas Jankowski prepared a plan to execute search and arrest warrants at their home. Jankowski learned that the couple's three children, including then eleven-year-old Ephraim, lived at the home and that Lily took the children to school each morning. Jankowski thus planned to serve the warrants after Lily had taken the children to school.

On the morning of March 23, 1998, a team of approximately twenty-three agents gathered at an area away from the Tekle home for briefing.[2] Another team of agents arrested Lily without incident after she dropped off two of her children at school. The agents asked Lily for the garage door opener to her house, and she told them to be careful because her eleven-year-old son was at home and her husband recently had suffered a heart attack and undergone major heart surgery. The agents communicated by radio with the team of agents at the Tekle home and informed them of what Lily had told them.

At the Tekle residence, the agents announced the presence of law enforcement officers over a public address system. Jankowski also called Solomon Tekle on a cellular telephone, asking him to surrender himself at the front door.

recitation of the facts because the case arose in the posture of a motion for summary judgment and involved issues of qualified immunity). We disagree with the government that Tekle has failed to produce any admissible evidence sufficient to create a genuine issue of material fact, pursuant to *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956 (9th Cir. 2004). In response to the government's filing of the declarations of its agents, Tekle filed his own deposition, as well as depositions of both his parents, with his opposition to the government's motion for summary judgment.

[2]The agents were from the IRS, the DEA, and the Los Angeles Police Department.

Immediately prior to the agents' announcement, Tekle opened the garage door and exited the garage in order to take out the trash, unaware of the agents' presence. He was barefoot and was wearing a t-shirt and shorts. He saw numerous police cars and heard a "loud intercom" over which the officers were saying, "Young man, turn around and put your hands in the air." Because he did not realize they were speaking to him, he turned around and started running back to the house through the garage. The agents again told him to turn around with his hands up, and Tekle turned around and started walking out of the garage with his hands up.

One of the officers told Tekle to get on the ground, so he lay face down on the driveway. The officer held a gun to Tekle's head, searched him, and handcuffed him. The officer pulled Tekle up from behind by the chain of the handcuffs and took him out to the sidewalk, where Tekle sat, still handcuffed, with his feet "in the gutter" until his father, Solomon, was brought out of the house in handcuffs, approximately fifteen minutes later.

After Solomon came out of the house, the officers removed the handcuffs from Tekle and sat him on a stool in the driveway, where about fifteen to twenty officers kept their guns pointed at him. Tekle asked if he could use the restroom, but one of the officers followed him to the restroom, keeping his hand on his gun, and would not let Tekle close the door, so Tekle returned to the driveway. One of the officers asked Tekle where his parents were from, and Tekle replied that he was born here but that his parents were from Ethiopia. The officer said, "Ethiopia is an f'n ugly country, and there's nothing to see there." When Tekle asked for his shoes, another officer threw the shoes on the ground and spat on them. Several hours later, one of Tekle's relatives came to the house to pick him up.

In his complaint, Tekle sought declaratory relief and dam-

ages.[3] He alleged claims for false arrest, assault and battery, and mental distress pursuant to the FTCA. He further alleged violations of his federal and state civil rights. The district court granted summary judgment in favor of the defendants, concluding that the force used was reasonable and, in the alternative, that Fourth Amendment law governing the agents' conduct was not clearly established at the time of the incident. Accordingly, it held that the agents were entitled to qualified immunity. The court also concluded that Tekle had not raised an issue of triable fact regarding the reasonableness of his detention. The court entered judgment in favor of the individual defendants and the United States, and Tekle timely appealed.

## STANDARD OF REVIEW

The district court's grant of a motion for summary judgment is reviewed de novo. *Blanford v. Sacramento County*, 406 F.3d 1110, 1114 (9th Cir. 2005). "Viewing the evidence in the light most favorable to the nonmoving party, . . . and drawing all reasonable inferences in favor of that party, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Galvin v. Hay*, 374 F.3d 739, 745 (9th Cir. 2004). In evaluating a claim of qualified immunity, we first must determine whether, when viewed in the light most favorable to Tekle, the alleged facts show a violation of a constitutional right. *Blanford*, 406 F.3d at 1114-15. If the answer is yes, we then must determine whether the constitutional right at issue was clearly established at the time of the alleged violation. *Id.* at 1115. " 'The contours of the right must be sufficiently clear that a reasonable official would understand

---

[3]After Tekle's first two complaints were dismissed without prejudice on procedural grounds with respect to the individually named defendants, he filed another complaint against them, and the two actions were consolidated under the original action, which included the United States as a defendant.

that what he is doing violates that right.' " *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## DISCUSSION

"*Bivens* is a judicially created cause of action against federal officers arising under the United States Constitution." *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991). FTCA actions, by contrast, are created by statute. "The FTCA provides a waiver of the United States government's sovereign immunity for tort claims arising out of the conduct of government employees acting within the scope of their employment." *Adams v. United States*, 420 F.3d 1049, 1051 (9th Cir. 2005). "The FTCA specifies that the liability of the United States is to be determined 'in accordance with the law of the place where the [allegedly tortious] act or omission occurred.' " *Rhoden v. United States*, 55 F.3d 428, 430 (9th Cir. 1995) (per curiam) (quoting 28 U.S.C. § 1346(b)) (alteration in the original). California law therefore governs the United States' liability in Tekle's FTCA claim. *See Galvin*, 374 F.3d at 758 (applying California law to determine the liability of federal officers for false arrest); *Cervantes v. United States*, 330 F.3d 1186, 1188 (9th Cir. 2003) (same); *see also Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994) ("Liability is determined by the tort law of the state where the claim arose.").

## I. *Bivens* Claims

Tekle alleges that the individual defendants used excessive force when they pointed a gun at his head and pointed guns at him for the duration of the incident, and that they subjected him to an unreasonable detention. We hold that Tekle has raised genuine issues of material fact regarding whether the officers' conduct violated his constitutional rights and therefore reverse the district court's grant of summary judgment in favor of defendants on Tekle's *Bivens* claims.

## A. Excessive Force

**[1]** "[U]se of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 202. In determining whether the force used was reasonable, we must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Blanford*, 406 F.3d at 1115 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The legal framework is clearly established. The first factor in determining whether the force used was excessive is the severity of the force applied. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003), *cert. denied*, 542 U.S. 918 (2004). The second factor, and the most important, is the need for the force. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The amount of force used is " 'permissible only when a strong government interest *compels* the employment of such force.' " *Drummond*, 343 F.3d at 1057 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)). Factors to be considered in determining the need for the force include " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Blanford*, 406 F.3d at 1115 (quoting *Graham*, 490 U.S. at 396).

Finally, we must balance the force used against the need, to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). This determination

> "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. Because such balancing nearly always requires a

jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations.

*Id.* at 853 (quoting *Graham*, 490 U.S. at 396) (internal citations omitted).

**[2]** We now apply the framework to the facts of this case. The first factor is the severity of the force. *Drummond*, 343 F.3d at 1056. We have held that the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury. *See Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc). In *Robinson*, police were told that a man carrying a shotgun had shot two dogs and was yelling at someone. Robinson, the plaintiff, approached the police to explain the situation to them, but the officers pointed their guns at his head, handcuffed him, and shoved him into their car, refusing to listen to his explanation of the situation. He was released after fifteen to thirty minutes. We agreed with the Third Circuit that officers who "pointed guns at people not under suspicion, handcuffed them and detained them for 25 minutes could be liable for a Fourth Amendment violation" because the " 'use of guns and handcuffs must be justified by the circumstances.' " *Id.* at 1014 (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995)).

**[3]** Here, viewing the facts in the light most favorable to Tekle, approximately twenty-three armed officers saw a barefoot, eleven-year-old boy, clad in shorts and a t-shirt, emerge from his home.[4] Although he tried to return to the house after

---

[4]There is no dispute that Tekle was eleven years old at the time of the incident. The government has attempted to portray Tekle as more threaten-

hearing the initial "intercom," he then stopped and cooperated. He did not attempt to flee, nor did he resist them, but he complied with their requests, lying face down on the driveway. He was unarmed.[5] The officers then held a gun to his head, searched him, handcuffed him, pulled him up from behind by the chain of the handcuffs, and sat him on the sidewalk, still handcuffed, with their guns pointed at him, for ten to fifteen minutes. Only after they removed his father from the home in handcuffs did they remove the handcuffs from Tekle. They then sat him on a stool, with their guns still drawn, for another fifteen to twenty minutes. We conclude under these circumstances that the amount of force used against Tekle constituted a " 'very substantial invasion of [his] personal security.' " *Id.* at 1015 (quoting *Baker*, 50 F.3d at 1193). Consequently, this factor weighs in favor of Tekle.

[4] Turning to the second and most important factor, we conclude that "the need for the force, if any, was minimal at best." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

---

ing than he appeared. For example, Agent Jankowski described Tekle as a "young male, approximately five feet tall," in his declaration prepared for this litigation. However, in a Memorandum of Activity dated April 7, 1998, approximately two weeks after the incident, Jankowski stated that Tekle "appeared to be about 12 to 14 years old," and Agent David Hawkes similarly described Tekle as appearing to be between those ages in his April 2, 1998, Memorandum of Activity. These memoranda indicate that, although Tekle may have appeared slightly older than his actual age, it still was apparent to the officers at the time that Tekle was a child. Moreover, the agents knew that Solomon had an eleven-year-old child, and, when Lily was arrested, she told the arresting agents that her eleven-year-old son was at home. This information allegedly was conveyed to the team of agents at the Tekle home prior to the incident. For all these reasons and taking into account the summary judgment posture of the case, we assume throughout this opinion that Tekle clearly was a child and appeared to be approximately eleven to twelve years old to the officers at the scene.

[5]The government urged at oral argument that Tekle could have been armed. There is no evidence in the record, however, to support such an assertion, and there has never been any allegation that the officers thought Tekle was armed.

All the factors to be considered in determining the need for the force weigh in favor of a finding that the need for force was minimal. First, Tekle clearly was a child and was not the subject of the arrest warrant. Tekle was unarmed and vastly outnumbered and did not pose an immediate threat to the officers' safety. He did not actively resist arrest or attempt to flee. Under these circumstances, even if the officers needed to secure Tekle in order to execute the search and arrest warrants, it should have been apparent that this eleven-year-old boy did not pose a threat and that the need for force accordingly was minimal. *Cf. id.* (finding the force excessive where the officer threw the plaintiff to the ground and handcuffed her, despite the fact that she posed no safety risk and made no attempt to leave the property); *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir. 2005) (stating that the governmental interests in using handcuffs were at a minimum when there was no indication that officers believed the suspects would flee or be armed), *cert. denied*, 126 S. Ct. 1331 (2006); *Wall v. County of Orange*, 364 F.3d 1107, 1111-12 (9th Cir. 2004) (reversing the grant of summary judgment where the deputy violently arrested the plaintiff, handcuffing his hands tightly, even though there was no probable cause for arrest and the plaintiff was following the deputy's instructions).

**[5]** Balancing the force used against the need, we conclude that, "when the disputed facts and inferences are treated in the manner required by law, a jury could properly find" that the force used was "greater than [was] reasonable under the circumstances." *Santos*, 287 F.3d at 853, 854. There were over twenty officers present at the scene, and Tekle was not suspected of any crime. He was cooperative and unarmed and, most importantly, he was eleven years old. A reasonable agent confronted with these circumstances should have known that there was no need to use guns and handcuffs. Yet, the officers kept Tekle handcuffed and pointed their weapons at him even after it was apparent that he was a child and was not resisting them or attempting to flee. Moreover, Tekle has alleged that an officer pulled him up from behind by the chain

of the handcuffs, an act which, if true, could support a jury finding of excessive force. We understand that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Nonetheless, we are convinced, if only by the sheer number of officers versus the one, clearly unarmed, barefoot child that a reasonable jury could find that the officers used excessive force.

**[6]** " '[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.' " *Wall*, 364 F.3d at 1111 (quoting *Saucier*, 533 U.S. at 201). "[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law." *Drummond*, 343 F.3d at 1060-61. The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[I]n the absence of binding precedent, we 'look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts.' " *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (quoting *Drummond*, 343 F.3d at 1060).

**[7]** We have held since 1984 that pointing a gun at a suspect's head can constitute excessive force in this circuit. *See Robinson*, 278 F.3d at 1014 (stating that "under more extreme circumstances the pointing of a gun has been held to violate even the more rigorous standard applicable before *Graham*, when plaintiffs were required to establish conduct so excessive that it 'shocked the conscience' ") (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1010 (9th Cir. 1984)); *see also Baldwin*, 418 F.3d at 970 (stating that officers "violated the civil

right of the plaintiffs to be free from battery by gun-wielding officers, a right established in this circuit since 1984"). The plaintiffs in *McKenzie* were suspected of trying to sell stolen jewelry and of possibly being tied to a prior robbery and murder. The officers burst into the room with weapons drawn, forced the plaintiffs to the wall, handcuffed them, threw them to the floor, and pressed their guns against the plaintiffs' heads, refusing at first to identify themselves as police officers. We found "ample basis for a jury to find the police officers' conduct excessive." *McKenzie*, 738 F.2d at 1011.

In *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), a police officer held a gun to the head of a nine-year-old and threatened to pull the trigger during a search of the child's residence. The officer argued that he was entitled to immunity because it was not clearly established at the time that it was an unconstitutional use of force for a police officer to point a gun at a resident's head during a lawful search of the residence. *Id.* at 293. The Seventh Circuit rejected this argument, stating that, although "[t]he level of generality at which the relevant legal 'rule' is identified cannot be so abstract as to convert the rule of qualified immunity into a rule of virtually unqualified liability," "this does not require a prior case that is 'precisely on all fours on the facts and law involved here.' " *Id.* (quoting *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 676 (7th Cir. 1990)). The court then concluded that it was clearly established that the force used by the officer was constitutionally proscribed. *Id.* at 294.

**[8]** Similar to *McDonald*, Tekle was a minor at the time of the incident and "posed no threat to the safety of . . . any . . . officer present, was not actively resisting arrest or attempting to evade arrest by fleeing, and was not engaged in any assaultive behavior toward . . . the . . . officers." *Id.* at 292-93; *see also Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (holding that judgment as a matter of law was erroneously granted where the deputy sheriff grabbed a ten-year-old child out of a chair and dragged her into another room in the course of her

father's arrest, even though she "was not under arrest and posed no threat to anyone"); *Baker*, 50 F.3d at 1193-94 (concluding that the plaintiffs had presented evidence sufficient to withstand summary judgment where officers pointed guns at the plaintiffs, including three minors, aged seventeen, seventeen, and fifteen, and handcuffed some of them for up to twenty-five minutes, where there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used"). *McKenzie*, *McDonald*, *Ikerd*, and *Baker* all were decided prior to 1998, the year of the events in this case. "[W]e conclude that the officers had 'fair warning' that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts." *Drummond*, 343 F.3d at 1061 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *cf. McDonald*, 966 F.2d at 294 (reasoning that the officer "would have no reason to think that [the Seventh] Circuit would reject [the Third Circuit's] holding" regarding the reasonableness of his actions). Although there may not be a prior case specifically prohibiting the use of handcuffs and weapons by more than twenty officers to subdue an unarmed eleven-year-old boy who is not suspected of any wrongdoing and is cooperating with the officers, "*[a]ny* reasonable officer should have known that such conduct constituted the use of excessive force." *Drummond*, 343 F.3d at 1061.

[9] A reasonable officer would have known that the force used against Tekle violated his constitutional rights. *See, e.g.*, *id.* at 1061-62 (reversing the district court's grant of summary judgment in favor of the officers and remanding for trial because a reasonable officer would have known that pressing his weight on a person who was handcuffed and offering no resistance, constituted the use of excessive force, "even absent a Ninth Circuit case presenting the same set of facts"). We thus conclude that the district court erred in granting summary judgment in favor of the defendants on this claim.

## B. Unreasonable Detention

Tekle further contends that his detention was unreasonable, relying on *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994), in which we concluded that officers conducted a detention in connection with a search unreasonably, "by removing a gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours," despite the fact that they had no reason to believe he had committed a crime or was armed. *Id.* at 876-77. We conclude that the way handcuffs were used on Tekle rendered his detention unreasonable.

**[10]** "An officer's authority to detain incident to a search is categorical . . . ." *Muehler v. Mena*, 544 U.S. 93, 98 (2005). "[P]olice do not, however, have unfettered authority to detain a building's occupants in any way they see fit." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006). Rather, the detention must be conducted "in a reasonable manner." *Id.*; *see also Muehler*, 544 U.S. at 98-99 (stating that officers have the "authority to use *reasonable* force to effectuate the detention" of a building's occupants) (emphasis added); *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir. 2003) (stating that, apart from police conduct that is per se unreasonable, we must balance privacy concerns and law enforcement concerns to determine if the detention was reasonable). "[D]etaining a person in handcuffs during the execution of a warrant to search for evidence is permissible, but only when justified by the totality of the circumstances." *Meredith*, 342 F.3d at 1062-63; *see also Robinson*, 278 F.3d at 1014 (agreeing with the Third Circuit that the use of guns and handcuffs must be justified by the circumstances).

In *Muehler*, the Supreme Court considered the reasonableness of the detention of an occupant of a house that was searched pursuant to a search warrant. Iris Mena, who was not suspected of criminal wrongdoing, rented a room in her house

to a gang member who was suspected of involvement in a driveby shooting. Police obtained a search warrant for the home to search for weapons and evidence of gang membership. The officers placed Mena in handcuffs at gunpoint when they first entered the home, moved her into a converted garage with three other people found on the property, and detained her in handcuffs throughout the two-to-three-hour search.

The Court concluded that the "use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion." *Muehler*, 544 U.S. at 99. The Court relied on the fact that "this was no ordinary search" because it involved "a search for weapons and a wanted gang member resides on the premises," making it an "inherently dangerous situation[ ]." *Id.* at 100. The Court also noted that "this case involved the detention of four detainees by two officers." *Id.* The governmental interests in detaining and using handcuffs thus were "at a maximum."[6] *Id.*

*Dawson* relied on *Muehler* to find reasonable the detention of a boardinghouse's tenants during a two-hour inspection by public health officials for rodent infestation. *Dawson*, 435 F.3d at 1066-70. We pointed to the fact that the landlord was associated with a man with a violent criminal history who previously had threatened inspectors, as well as to the fact that police did not know how many people were inside the building, concluding that "[a]llowing an unknown number of unidentified people to move about unsupervised during an

---

[6]Judge Kleinfeld asserts that this case is "analogous" to *Muehler*, characterizing *Muehler* as involving a "small, barefoot woman" being detained in handcuffs. Kleinfeld concurring op. at 9370-71. While both cases involve detention in handcuffs, the detention of a single, unarmed boy by over twenty armed officers simply is not analogous to the detention of four individuals (presumably adults, although the case does not specify) by only two officers.

involuntary inspection would dramatically increase the likelihood that an occupant could injure or kill an officer, or that an officer might mistakenly injure an occupant." *Id.* at 1067.

Significantly, *Dawson* did not involve either the use of handcuffs or children. And, although *Muehler* involved the use of handcuffs, they were used on adults in a situation where the officers were outnumbered by the detainees. Unlike both *Dawson* and *Muehler*, here, law enforcement personnel vastly outnumbered Tekle, more than twenty to one. It was apparent at the time that he was not the subject of the arrest warrant. Nor was there a suspicion that there were deadly weapons and a gang member thought to be "armed and dangerous" on the premises. *Muehler*, 544 U.S. at 95.

Tekle was barefoot, unarmed, clad in shorts and a t-shirt, and appeared to be approximately twelve years old. He was alone, and there were twenty-three armed officers. He was not resisting the officers but was lying face down on the ground with his arms stretched in front of him. Moreover, the officers already had searched Tekle and "uncovered no weapons or anything else to warrant further concern for their safety." *Bennett v. City of Eastpointe*, 410 F.3d 810, 837 (6th Cir. 2005). Yet Tekle remained handcuffed for fifteen to twenty more minutes, and an officer allegedly lifted him from behind by the chain of the handcuffs. We conclude that a reasonable jury could find that the officers' use of handcuffs rendered Tekle's detention unreasonable. *Cf. id.* (concluding that the use of handcuffs during a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), violated the Fourth Amendment rights of the plaintiffs, described as "youths," because the officers had conducted pat-down searches and uncovered no weapons and the officers had no reason to believe the youths were dangerous or would flee). We accordingly turn to whether it would be clear to a reasonable officer that his conduct was unlawful in light of existing law. *Saucier*, 533 U.S. at 202; *Drummond*, 343 F.3d at 1060-61.

We stated in *Meredith* that, as of July 10, 1998, "it was not clearly established in this (or any other) circuit that simply handcuffing a person and detaining her in handcuffs during a search for evidence would violate her Fourth Amendment rights." *Meredith*, 342 F.3d at 1063. None of the plaintiffs in *Meredith*, however, was an eleven-year-old child.

[11] Moreover, in *Franklin*, we stated that detentions of children raise particular concerns that must be assessed with the other circumstances. *Franklin*, 31 F.3d at 876. The Seventh Circuit's decision in *McDonald*, relying in part on the fact that the plaintiff was a child, was decided in 1992. *See McDonald*, 966 F.2d at 295; *see also Ikerd*, 101 F.3d at 435 (a Fifth Circuit case decided in 1996 also involving the use of excessive force against a child); *Baker*, 50 F.3d at 1193 (a Third Circuit case, deciding in 1995 that the use of guns and handcuffs during a twenty-five minute detention of seventeen- and fifteen-year-old children supported a finding that their constitutional rights were violated). The totality of the circumstances supports the conclusion that not only was Tekle's detention unreasonable, but a reasonable officer would have known that an eleven-year-old child who was unarmed, barefoot, vastly outnumbered, and was not resisting arrest or attempting to flee should not have been kept in handcuffs for fifteen to twenty additional minutes.

## II.   FTCA Claims[7]

---

[7]The government argues that Tekle has waived his FTCA claim for failure to raise the issue in his opening brief. We acknowledge that Tekle has not based his claim on tort law, which is the applicable law. We note, however, that there are five pages of argument devoted to the district court's perceived error in granting summary judgment in favor of the United States on the FTCA claim. Moreover, the government is not prejudiced because it "thoroughly discussed the question in its own brief." *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1278 (9th Cir. 1994). Contrary to Judge Kleinfeld's assertion that Tekle has not asked us to address his FTCA claims, Kleinfeld concurring op. at 9371, his brief clearly asserts that the district court erred in granting summary judgment

In his complaint, Tekle alleged three tort claims: false arrest, assault and battery, and intentional infliction of emotional distress. Generally, "the United States is liable 'to the same extent as a private individual under like circumstances.' " *Galvin*, 374 F.3d at 758 (quoting 28 U.S.C. § 2674). The FTCA provides an exception to the United States' liability for certain torts, including assault, battery, and false arrest. 28 U.S.C. § 2680(h). When such a tort is committed by a federal law enforcement officer, however, liability is restored. *Id.*

We previously have stated that " '[law enforcement] obligations make the law of citizen arrests an inappropriate instrument for determining FTCA liability.' " *Galvin*, 374 F.3d at 758 (quoting *Arnsberg v. United States*, 757 F.2d 971, 979 (9th Cir. 1985)) (alteration in original). Thus, when federal officers are involved, we have held that the United States' liability is determined by " 'the law governing arrests pursuant to warrants.' " *Ting*, 927 F.2d at 1514 (quoting *Arnsberg*, 757 F.2d at 979).

**[12]** The Supreme Court, however, recently held that the United States' liability under the FTCA is to be based on the state law liability of a private party, not of a state or municipal entity. *United States v. Olson*, 126 S. Ct. 510, 511-12 (2005). The issue in *Olson* was the liability of the United States for allegedly negligent inspections by federal mine inspectors. The Court reversed a line of Ninth Circuit precedent permitting liability under the FTCA where local law would make a state or municipal entity liable. *Id.* The Court stated in broad

---

in favor of the United States on his tort claims. *See* Appellant's Opening Br. at 23-24. The failure to discuss the United States' liability under tort law appears to be due to counsel's failure to understand the law applicable to an FTCA claim. Because he raised the issue and the government is not prejudiced, we exercise our discretion to address the issue, especially in light of our holding that the district court erred in granting summary judgment in favor of the defendants on the *Bivens* claims.

terms that the FTCA means what it says — "namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *Id.* at 511 (quoting 28 U.S.C. § 1346(b)(1)).**[8]** We therefore examine the law regarding the liability of a private person for false arrest, assault and battery, and intentional infliction of emotional distress.

## A.   False Arrest

Under California law, false arrest, or false imprisonment, is "the unlawful violation of the personal liberty of another." Cal. Penal Code § 236; *see Collins v. City & County of San Francisco*, 123 Cal. Rptr. 525, 526 (Ct. App. 1975) (stating that false arrest is "but one way of committing a false imprisonment, and they are distinguishable only in terminology"). "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 95 Cal. Rptr. 2d 316, 323 (Ct. App. 2000).

**[13]** A private person may make an arrest, which is "taking a person into custody, in a case and in the manner authorized by law." Cal. Penal Code § 834.

> A private person may arrest another: 1. For a public offense committed or attempted in his presence. 2. When the person arrested has committed a felony, although not in his presence. 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it.

---

**[8]**The exception to the exception, restoring liability when false arrest, assault, and battery are alleged against law enforcement officers, does not provide a different standard for liability. *See* 28 U.S.C. § 2680(h). It merely reverts to 28 U.S.C. § 1346(b), which means the United States' liability is based on a private person's liability. *Id.*

Cal. Penal Code § 837. While a law enforcement officer may arrest a person without a warrant when he has probable cause to believe that the arrestee committed a misdemeanor in his presence, a private person may only arrest someone for a misdemeanor when the offense actually has been committed or attempted in his presence. *Hamburg v. Wal-Mart Stores, Inc.*, 10 Cal. Rptr. 3d 568, 580 (Ct. App. 2004). Reasonable cause to believe that a misdemeanor has been committed is not sufficient. *Id.* at 581. When a private person is entitled to make an arrest, he is entitled to use reasonable force to detain the person. *People v. Fosselman*, 659 P.2d 1144, 1148 (Cal. 1983) (en banc); *see also People v. Garcia*, 78 Cal. Rptr. 775, 779 (Ct. App. 1969) (stating that when a private citizen was assaulted in the course of effecting a citizen's arrest, he was "justified in using such force as was reasonable for defendant's arrest and detention").

**[14]** Here, there is no evidence that the officers had any reason to believe that Tekle had committed a misdemeanor in their presence. Moreover, as discussed *supra*, based on the evidence provided by Tekle, a jury could find that the force used to detain him was not reasonable. Tekle accordingly has raised genuine issues of material fact regarding the officers' liability for false arrest. We therefore reverse the district court's grant of summary judgment on Tekle's false arrest claim.

## B. Assault and Battery

Tekle's second allegation under the FTCA was that the officers assaulted him "by willfully and maliciously pointing a loaded firearm at [him] and threatening to shoot him." He further alleged that they committed battery "by placing handcuffs upon him, pushing him to the ground and forcing him to lay [sic] down and to sit with the handcuffs still on for an appreciable period of time."

Assault and battery are defined in the California Penal Code. Assault is the "unlawful attempt, coupled with a pres-

ent ability, to commit a violent injury on the person of another." Cal. Penal Code § 240. "A battery is any willful and unlawful use of force or violence upon the person of another." Cal. Penal Code § 242. "Harmful or offensive contact, intentionally done, is the essence of battery, while apprehension of that contact is the basis of assault." 5 B.E. Witkin, Summary of Cal. Law, *Torts* § 383 (10th ed. 2005) (citations omitted).

To establish civil assault, Tekle would need to establish that (1) the officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to him that they were about to carry out the threat; (3) he did not consent to the conduct; (4) he was harmed; and (5) the officers' conduct was a substantial factor in causing the harm. *See Judicial Council of Cal., Civil Jury Instructions* No. 1301 (2006) (listing the elements of an assault claim). Tekle testified that, while he was lying on the ground, an officer placed a gun to his head and then handcuffed him. He also stated that the officers had "all sorts of different guns, big ones and small ones, pointing at [him]" while he was sitting on the stool in the garage. Five years after the incident, he still had flashbacks, insomnia, and depression, and he had been treated by two psychiatrists and two psychologists. He further testified that, although he has never committed a crime, he still felt nervous whenever he saw a police officer.

The elements of a battery claim in California are that (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, loss or harm to the plaintiff. *Cole v. Doe 1 thru 2 Officers of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005). According to Tekle's deposition, an officer handcuffed him while he was lying face down on the ground and that he then picked him up by the chain of the handcuffs, cutting his skin.

**[15]** Over twenty armed officers encountered a barefoot, unarmed eleven-year-old boy who was not resisting them.

Tekle testified that the officers continued to keep their guns trained upon him throughout the incident and that one officer picked him up from behind by the chain of the handcuffs. He certainly did not consent to the conduct, and he has alleged that he suffered harm. We conclude that Tekle has raised a genuine issue of material fact as to whether the officers may be liable for assault and battery. We therefore reverse the district court's grant of summary judgment on this claim.

## C. Intentional Infliction of Emotional Distress

Tekle's third FTCA claim was for intentional infliction of emotional distress. The elements of a prima facie case of intentional infliction of emotional distress in California are " '1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982) (quoting *Cervantez v. J.C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979)). In order to be considered outrageous, the conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation marks omitted). Where reasonable persons may differ, the trier of fact is to determine whether " 'the conduct has been sufficiently extreme and outrageous to result in liability.' " *Cross v. Bonded Adjustment Bureau*, 55 Cal. Rptr. 2d 801, 811 (Ct. App. 1996) (quoting *Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 762 P.2d 46, 63 (Cal. 1988) (en banc)).

In *Cross*, the court concluded that reasonable minds could differ as to whether the defendant's conduct was sufficiently extreme and outrageous where the defendant, a collection agency, made affirmative misrepresentations to the plaintiffs who hired it and persuaded the plaintiffs to accept $40,000 on a judgment worth over $250,000. *Id.* The court stated that the

agency's actions "were intentional and done with the foresee-able consequence that the [plaintiffs] would suffer severe emotional distress once they discovered the truth." *Id.*

**[16]** The district court here concluded that the agents did not engage in extreme and outrageous conduct. We disagree that such a conclusion can be reached on these facts as a matter of law. In addition to testifying that the officers kept their weapons pointed at him and picked him up off the ground by the chain of the handcuffs, Tekle also testified that an officer made disparaging remarks about Ethiopia. When Tekle asked a different officer if he could put on some shoes, the officer threw Tekle's shoes at him and spit on them. In light of the conclusion in *Cross* that a collection agency's abuse of its fiduciary duty, which adversely affected the plaintiffs' financial interests, could support a claim for intentional infliction of emotional distress, we conclude that reasonable minds could differ as to whether the conduct alleged here by Tekle was sufficiently extreme and outrageous to support such a claim. We therefore reinstate Tekle's intentional infliction of emotional distress claim.

## CONCLUSION

Viewing the facts and drawing all inferences in Tekle's favor, we conclude that the alleged facts show a violation of Tekle's constitutional rights. We further conclude that a reasonable officer should have known that it was constitutionally excessive to use such force and to use the handcuffs in the manner alleged against an unarmed eleven-year-old child who was cooperating with the officer's requests. We therefore reverse the grant of summary judgment in favor of the officer-defendants on Tekle's *Bivens* claims. Because the grant of summary judgment in favor of the United States was predicated on the district court's erroneous conclusions regarding the excessive force and unreasonable detention claims, we also reverse the grant of summary judgment in favor of the

United States on the FTCA claims and remand for further proceedings.

**REVERSED and REMANDED**.

---

KLEINFELD, Circuit Judge:

I concur in the result.

I agree that pointing guns at the boy amounted to the use of excessive force under well-established precedent, so the officers who did so lack qualified immunity.

Regarding the handcuffs, I would also reverse, but more narrowly.

A reasonable officer could believe that the boy could interfere with legitimate law enforcement in at least two ways. He could leap on the officers or run in front of them as they tried to control his father. Though only eleven, the evidence was that he was between five and six feet tall. Alternatively, he could run around the neighborhood stirring up older youths and adults to interfere. He had already run back toward the house in violation of the officers's command, "Young man, turn around and put your hands in the air." His youth might make him less physically dangerous, but more impulsive and energetic than an adult, and he was not a small child. It was not unreasonable for the officers to believe that he might interfere with their legitimate activities.

I would reverse the district court on only one aspect of the use of the handcuffs: lifting the boy to his feet by the handcuffs which were fastened behind him. No law enforcement purpose has been offered to justify that sadistic bit of bullying. Though there is no case holding that pulling an unresisting non-suspect to his feet by handcuffs fastened behind him

amounts to the use of excessive force, the cases do establish that the needless and wanton infliction of pain during a search or arrest violates the Constitution.[1] The proposition that police may not inflict pain on non-suspects detained during a search, in the absence of any law enforcement reason, should be so obvious to reasonable officers that qualified immunity cannot shield them. A policeman ought to know that he is not constitutionally entitled to hurt people for no reason.[2]

Though the majority's holding is not clear, it seems to be that (1) keeping the boy handcuffed for fifteen or twenty minutes after the officers had searched him and found no weapons was excessive, and (2) this is so well established that any reasonable officer ought to know it, so the officers lacked qualified immunity. The opinion appears to hold that even though the boy's father, for whom the warrant had been issued, had not yet been handcuffed and brought outside, the officers should have removed the handcuffs from his son once they ascertained that the son was not armed.

The majority errs in two respects. First, it was not unconstitutional to keep the boy handcuffed while the warrant was still being executed. We made the same mistake in *Mena v. City of Simi Valley,*[3] and the Supreme Court corrected it in *Muehler v. Mena.*[4] Although the small, barefoot woman in *Muehler* was not herself a threat, the Court held that her "detention in handcuffs for the length of the search" was constitu-

---

[1]*See*, *e.g.*, *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (Holding that forcibly throwing a woman to the ground and twisting her arms while handcuffing her amounted to excessive force because it was unnecessary).

[2]*See*, *e.g.*, *Headwater Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002).

[3]*Mena v. City of Simi Valley*, 332 F.3d 1255 (9th Cir. 2003) *rehearing and rehearing en banc denied*, 354 F.3d 1015 (9th Cir. 2004) (Kleinfeld, J., dissenting).

[4]*Muehler v. Mena*, 544 U.S. 93 (2005).

tionally permissible.[5] The search in *Muehler* was not of the woman, but of the residence. The cases are analogous. Under *Muehler*, the majority errs in limiting the duration to the search of the boy, as opposed to execution of the search warrant for the home and arrest warrant for the father. The Court rejected our view that the two or three hour duration of the handcuffing of *Muehler* made it unconstitutional, yet here we hold that, as soon as the officers knew the boy was unarmed they had to take off the handcuffs, even though the search and arrest were still ongoing. The large number of officers who supposedly had their guns pointed at the boy does not justify requiring the officers to remove the handcuffs. The point was to control the boy and prevent him from making trouble, not to shoot him if he did make trouble.

The majority goes on to deny qualified immunity for keeping the handcuffs on after the boy was found to have no weapons. Such a denial of qualified immunity requires not only that it was unconstitutional to keep him handcuffed until the house was searched and his father was arrested, but also that any reasonable officer should have known that it was unconstitutional.[6] This strikes me as bizarre, because no case supports the proposition that keeping an individual handcuffed during a search is unconstitutional except for our decision[7] reversed in *Muehler*.[8]

The majority should not reach the Federal Tort Claims Act issues, because Tekle's brief does not raise them.[9] He argues

---

[5]*Id*. at 95.

[6]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (Holding that government officials are entitled to qualified immunity in performing their discretionary functions unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

[7]*Mena v. City of Simi Valley*, 332 F.3d 1255 (9th Cir. 2003).

[8]*Muehler v. Mena*, 544 U.S. 93 (2005).

[9]*Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.").

exclusively that the officers violated his constitutional rights, not that they violated his state law rights. Reaching beyond Tekle's argument, and deciding tort law questions that he did not argue, strikes me as an especially unwise exercise of discretion in this case, because the civilian torts are a bad fit in cases where law enforcement officers execute a search warrant. Analyzing the case as if the officers were private persons who had not been commanded by a court to search a residence and arrest a man is an unreasonable application of *United States v. Olson*.[10] And there is no good reason to make all this dubious law, especially where appellant has not asked us to.

---

[10]*United States v. Olson*, ___ U.S. ___, 126 S. Ct. 510 (2005).